1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**ZIMMERMAN REED, LLP**
CHRISTOPHER P. RIDOUT (SBN 143931)
  Email: christopher.ridout@zimmreed.com
2381 Rosecrans Ave., Suite 328
Manhattan Beach, CA 90245
(877) 500-8780 Telephone
(877) 500-8781 Facsimile

*Attorneys for Plaintiff and the Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| MATTHEW BOUILLON, individually and on behalf of all others similarly situated, | CASE NO.: 3:18-CV-02565 |
| Plaintiff, | **COMPLAINT (CLASS ACTION)** |
| vs. | 1. Violation of the Stored Communications Act (SCA) (18 U.S.C. § 2701) |
| FACEBOOK, INC., a Delaware corporation, and DOES 1-10, inclusive, | (Jury Trial Demanded) |
| Defendants. | |

COMPLAINT (CLASS ACTION)

Plaintiff Matthew Bouillon, individually and on behalf of all similarly situated persons, by and through the undersigned attorneys alleges the following.

## NATURE OF THE ACTION

1.     In the run-up to the 2016 presidential election, Cambridge Analytica, LLC ("Cambridge"), with Defendant Facebook, Inc's ("Defendant" or "Facebook") help, stole the personal data of some 87 million Americans. Although the data breach has only recently made headlines, Defendant has been aware for years of the loopholes and vulnerabilities in its security measures that allowed this and similar breaches to occur. Yet Facebook did next to nothing to prevent the breach, and entirely failed to warn consumers that their information was at risk until well after the horse had left the barn. Facebook's actions and omissions were in direct violation of California and federal law, and broke a basic promise Facebook used to induce consumers to entrust Facebook with their personal information.

2.     During the entire relevant period, Facebook's terms of service assured users that they "own all of the content and information you post on Facebook, and you can control how it is shared through your privacy and application settings." *See* Facebook Terms of Service, January 30, 2015–present. https://www.facebook.com/terms.php.

3.     Further, in 2011, Facebook entered into a consent decree with the Federal Trade Commission requiring Facebook to "not misrepresent in any manner, expressly or by implication, the extent to which it maintains the privacy or security of covered information, including, but not limited to: … (C) the extent to which [Facebook] makes or has made covered information accessible to third parties." *In the Matter of Facebook, Inc., a corporation, Agreement Containing Consent Order*, ("FTC Consent Order"), at Section I.C.

4.     The FTC Consent Order defined Covered information as:
[I]nformation from or about an individual consumer including, but not limited to: (a) a first or last name; (b) a home or other physical address, including street name and name of city or town; (c) an email address or

other online contact information, such as an instant messaging user identifier or a screen name; (d) a mobile or other telephone number; (e) photos and videos; (f) Internet Protocol ("IP") address, User ID or other persistent identified; (g) physical location; or (h) any information combined with any of (a) through (g) above.

*Id*. at Section Definitions, 4.

5.     The FTC Consent Order required Facebook to:

[I]n connection with any product or service, in or affecting commerce, prior to any sharing of a user's nonpublic information by [Facebook] with any third party, which materially exceeds the restrictions imposed by a user's privacy setting(s), shall: A. clearly and prominently disclose to the user, separate and apart from any "privacy policy," "data use policy," "statement of rights and responsibilities" page, or other similar document: (1) the categories of nonpublic user information that will be disclosed to such third parties, (2) the identity or specific categories of such third parties, and (3) that such sharing exceeds the restrictions imposed by the privacy setting(s) in effect for the user; and B. obtain the user's affirmative express consent.

*Id*. at Sections II.A. and II.B.

6.     Facebook has admitted that it failed in its responsibility to prevent third parties – including Cambridge – from accessing and utilizing its users' data. On April 10, 2018, Facebook's CEO, Mark Zuckerberg, testified to the United States House of Representatives Committee on Energy and Commerce that:

[I]t's clear now that we didn't do enough to prevent these tools from being used for harm as well. That goes for fake news, foreign interference in elections, and hate speech, as well as developers and data privacy. We didn't take a broad enough view of our responsibility, and that was a big mistake. It was my mistake, and I'm sorry. I started Facebook, I run it, and I'm responsible for what happens here.

7.     In 2014, Cambridge improperly, and in violation of the Stored Communications Act, 18 U.S.C. §§ 2701, et seq., obtained the personal information of approximately 87 million registered Facebook users. This information included the users' full names, telephone numbers, mailing addresses, email addresses, ages, interests, physical locations, political and religious affiliations, relationships, pages they have liked, and groups to which they belong. Facebook users' personal information was

sold for approximately $7 million and was used in Cambridge's efforts to undermine the democratic process during the 2016 U.S. presidential election.

8.     Facebook knew about the misuse of 87 million users' data in 2015, but it did not notify users or discuss this breach publicly until forced to confront the issue on March 17, 2018.

9.     Facebook, contrary to the representations, obligations, and promises made to the federal government in 2011, knowingly set up its platform such that a third-party application developer who gained access to a user through an application could also access the personal information and data of that user's friends in violation of the Stored Communications Act, 18 U.S.C. §§ 2701, et seq. In addition, Facebook negligently failed to protect its users' data from such unauthorized access by a third party; upon learning about this unauthorized access and use of the personal data, failed to take reasonable steps required to claw back or, in the alternative, ensure the destruction of this data; and failed to notify its users' that such a breach had occurred, only admitting to the breach after their negligence was disclosed by a whistleblower.

10.     Plaintiff brings this class action on behalf of himself and all others similarly situated, asserting claims under the Stored Communications Act (18 U.S.C. §§ 2701, *et seq*.).

11.     Plaintiff seeks damages on behalf of the Class; injunctive relief; restitution; disgorgement; statutory penalties; costs and expenses, including attorneys' fees and expert fees; declaratory relief; and any additional relief that this Court determines to be necessary to provide complete relief to Plaintiff and the Class.

## THE PARTIES, JURISDICTION AND VENUE

12.     This Court has original jurisdiction of Plaintiff's and the Class' claims pursuant to 28 U.S.C. §§ 1331.

13.     Plaintiff Matthew Bullion ("Plaintiff") is a resident of the City and County of Denver, Colorado. Plaintiff has held a Facebook account since at least 2007. Plaintiff is an active user and has been at all relevant times.

14.     Defendant Facebook is a Delaware corporation with its principal place of business in Menlo Park, California.

15.     Plaintiff does not know the true names and capacities of the defendants sued herein as Does 1 through 10 ("Doe Defendants"), inclusive, and therefore sues said Doe Defendants by fictitious names. Plaintiff is informed and believes and based thereon alleges that each of the Doe Defendants is contractually, strictly, negligently, intentionally, vicariously liable and/or otherwise legally responsible in some manner for the acts and omissions described herein. Plaintiff will amend this Complaint to set forth the true names and capacities of each Doe Defendant when the same are ascertained.

16.     Plaintiff is informed and believes and based thereon alleges that Facebook and Doe Defendants 1 through 10, inclusive, and each of them, are and at all material times have been, the agents, servants or employees of each other, purporting to act within the scope of said agency, service or employment in performing the acts and omitting to act as alleged herein. Each of the Defendants named herein are believed to, and are alleged to, have been acting in concert with, as employee, agent, co-conspirator or member of a joint venture of, each of the other Defendants, and are therefore alleged to be jointly and severally liable for the claims set forth herein, except as otherwise alleged.

17.     Venue is proper in this District as Defendant is a corporation that does business in and is subject to personal jurisdiction in this District. Venue is also proper because a substantial part of the events or omissions giving rise to the claims in this action occurred in or emanated from this District, including decisions made by Facebook to permit Cambridge's collection of the data of personally identifiable information of the Plaintiff and the Class.

## **FACTUAL ALLEGATIONS**

18.     Facebook operates www.facebook.com, a social networking platform that allows users to create online profiles. These profiles contain personalized content such as the user's name, photos, videos, messages, comments, names of other users they

consider to be "friends," and interest groups. Users can interact with each other or the platform in a variety of ways, including by posting comments, sharing photos or video, chatting, using apps, playing online games, taking personality quizzes, or "liking" content by pressing a thumbs-up icon. Accordingly, user profiles often contain sensitive personal identifying information ("PII") including the user's name, location, political views, work history, e-mail address, birthday, educational background, hometown, relationship status, and religious beliefs.

19.    Facebook purportedly grants its users control over who can view the information users choose to include in their profiles. Facebook claims that "trust is important to us," and has promised users that Facebook "[does not] share information we receive about you with others unless we have . . . received your permission; given you notice such as by telling you about this policy; or removed your name and any other personally identifying information from it." *See* Facebook Data Use Policy (Nov. 15, 2013), https://www.facebook.com/full_data_use_policy (available as of Mar. 22, 2018).

20.    Facebook currently has approximately 2.2 billion active users. In the United States alone, approximately 214 million people (i.e., two thirds of the country's entire population) have active Facebook accounts.

21.    On March 17, 2018, the New York Times reported on Cambridge's use of personal identifying information ("PII") that it obtained from 50 million Facebook users without their permission. Cambridge obtained the data under the pretext that it was collecting it for academic purposes. The New York Times story revealed that the Trump campaign hired Cambridge to target voters online. *See* https://www.nytimes.com/2018/03/17/us/politics/cambridge-analytica-trump-campaign.html.

22.    By April 17, 2018, the number of Facebook users whose PII had been improperly accessed swelled to "much greater than 87 million." *See, e.g.*, Colin Lecher, *Former Cambridge Analytica employee says Facebook users affected could be 'much*

*greater than 87 million'*, THE VERGE (Apr. 17, 2018). https://www.theverge.com/2018/4/17/17246928/cambridge-analytica-facebook-quizzesdata.

23.     Cambridge obtained PII belonging to Facebook's users by exploiting a loophole in Facebook's application programming interface ("API"). An API is a set of methods of communication between software applications. An API allows software applications developed by outside entities to communicate with the host's systems. Facebook makes its API available to third-party application ("app") developers such as Cambridge.

24.     In 2014, a Cambridge researcher, Aleksandr Kogan ("Kogan") created an app called "ThisIsYourDigitalLife." The app was purportedly a personality quiz, and was falsely advertised as a research app for use by academic psychologists. In reality, however, the purpose of the app was to harvest the PII of Facebook users.

25.     From 2014 to 2015, ThisIsYourDigitalLife was deployed, and approximately 270,000 Facebook users took the quiz. The app used a vulnerability in Facebook's API to access and acquire the PII of not only those users who took the quiz, but also the PII of all of those users' "friends," i.e. linked user accounts. In total, PII was collected from approximately 87 million users.

26.     As reported in the Guardian, Cambridge used the PII collected from ThisIsYourDigitalLife to attempt to influence the 2016 United States presidential election:

> The data analytics firm that worked with Donald Trump's election team and the winning Brexit campaign harvested millions of Facebook profiles of US voters, in one of the tech giant's biggest ever data breaches, and used them to build a powerful software program to predict and influence choices at the ballot box.

> A whistleblower has revealed to the Observer how Cambridge Analytica – a company owned by the hedge fund billionaire Robert Mercer, and headed at the time by Trump's key adviser Steve Bannon – used personal information taken without authorization in early 2014 to build a system

that could profile individual US voters, in order to target them with personalized political advertisements.

Christopher Wylie, who worked with a Cambridge Analytica University academic to obtain the data, told the Observer: "We exploited Facebook to harvest millions of people's profiles. And built models to exploit what we knew about them and target their inner demons. That was the basis the entire company was built on

*Revealed: 50 Million Facebook Profiles Harvested For Cambridge Analytica In Major Data Breach*, The Guardian (March 17, 2018).

27.    In 2011 – years before the 2014 data breach – Facebook entered into a consent decree with the Federal Trade Commission, whereby Facebook agreed to refrain from sharing PII with third-party entities without its users' consent. Facebook further promised not to misrepresent to users that their PII was secure, when it was in fact not.

28.    Facebook learned of the 2014 breach shortly after it occurred. In 2015, Facebook learned that Cambridge had obtained the data collected by the ThisIsYourDigitalLife app. However, Facebook decided not to inform affected users that their PII had been compromised and misappropriated. Facebook further failed to inform the public at large.

29.    Facebook later claimed that, in 2015, Facebook had asked Cambridge to certify that it had destroyed the improperly collected data. Although Facebook claimed that Cambridge provided such certification, Facebook made no effort to determine whether the PII had in fact been deleted. In reality, Cambridge retained the data, and would later use it in concert with the Trump campaign to influence the 2016 presidential election.

30.    As of today, the data obtained by Cambridge is still in the hands of Cambridge and/or its affiliates.

31.    As a result of the data theft, Plaintiff's and Class members' PII is now in the hands of Cambridge and other unknown parties. Plaintiff and the Class are,

consequently, faced with an imminent and substantial risk of identity theft and other fraud, a concrete and particularized injury traceable to Facebook's conduct. By knowledge and belief, the stolen PII has already spread to other grounds, databases and the so-called "dark web," making it difficult or impossible to recover the data and prevent further misuse.

32.     Facebook was unaware of the security vulnerability exploited by Cambridge years in advance. Sandy Parakilas, the platform operations manager at Facebook responsible for policing data breaches by third-party software developers between 2011 and 2012, stated that he warned senior Facebook executives years ago that this could happen: "[M]y concerns were that all of the data that left Facebook servers to developers could not be monitored by Facebook, so we had no idea what developers were doing with the data … It was well understood in the company that that presented a risk … Facebook was giving data of people who had not authorised the app themselves … It has been painful watching because I know that they could have prevented it." Paul Lewis, "'Utterly Horrifying': Ex-Facebook Insider Says Covert Data Harvesting Was Routine," The Guardian (Mar. 20, 2018), https://www.theguardian.com/news/2018/mar/20/facebook-data-cambridge-analytica-sandyparakilas, last accessed Apr. 11, 2018.

33.     Plaintiff did not use the ThisIsYourDigitalLife app and did not consent to the sharing of his PII with Cambridge.

34.     Facebook has recently created a page that users can access to see whether they were victims of the Cambridge data breach. On April 30, 2018, Plaintiff check whether he was a logging in to his Facebook account and accessing the following URL: https://m.facebook.com/help/1873665312923476?helpref=search&sr=1&query=cambridge.

35.     After accessing the URL referenced in the preceding paragraph, the following image was displayed:

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## How can I tell if my information was shared with Cambridge Analytica?

Recently, we shared information about the potential misuse of your Facebook data by apps and websites. We also shared plans for how we're taking action to prevent this from happening in the future.

Check below to see if your information may have been shared with Cambridge Analytica by the app "This Is Your Digital Life."

### Was My Information Shared?

Based on our investigation, you don't appear to have logged into "This Is Your Digital Life" with Facebook before we removed it from our platform in 2015.

However, a friend of yours did log in.

As a result, the following information was likely shared with "This Is Your Digital Life":

- Your public profile, Page likes, birthday and current city

Accordingly, Plaintiff was a victim of the Cambridge data breach.

### CLASS ACTION ALLEGATIONS

36.     Plaintiff brings this action against Defendants pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of himself and all other persons similarly situated. Plaintiff seeks to represent the following class:

All Facebook users in the United States with Facebook accounts whose personal information was obtained by Cambridge from 2014 to 2015 without or in excess of the users' authorization.

37.     Excluded from the Class are: (a) any officers, directors or employees of Defendant; (b) any judge assigned to hear this case (or spouse or family member of any assigned judge); (c) any employee of the Court; and (d) any juror selected to hear this case. Plaintiff reserves the right to modify or amend the definition of the proposed Class before the Court determines whether certification is appropriate.

38.     All requirements for class certification in Fed. R. Civ. P. 23(a), 23(b)(1), 23(b)(2) or 23(b)(3) (or any other applicable state or federal rule of civil procedure) are satisfied with respect to the Class and the Class. Plaintiff and the respective Class Members were injured by Facebook's failure to protect user information. Facebook subjected Plaintiff and each Class member to the same unlawful actions and harmed them in the same manner.

39.     Numerosity: The proposed classes are so numerous that joinder of all members would be impracticable. Plaintiff believes that the Class includes 87 million people. The precise number and identities of Class members can be ascertained through discovery regarding the information kept by Defendants or their agents.

40.     Ascertainability: The community of interest among Class members in the litigation is well defined and the proposed classes are ascertainable from objective criteria. If necessary to preserve the case as a class action, the court itself can redefine the Class. Facebook maintains databases of its users and individual Class Members have access to accurate records that can confirm their membership in the proposed Class.

41.     Plaintiff's claims are typical of the Class, as Plaintiff and all other Class Members were injured in exactly the same way - by the unauthorized collection and sale of their personal information through Facebook.

42.     Plaintiff will fairly and adequately represent the interests of the Class and have retained counsel competent and experienced in class action and complex litigation.

43.     Plaintiff has no interests that are contrary to or in conflict with those of the Class.

44.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy under the acts described below. Given the nature of these claims, the expense and burden of individual litigation make it virtually impossible for the Class Members individually to seek redress for the unlawful conduct alleged.

45.     Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

46.     Common questions of law and fact exist as to all members of the Class and predominate over any questions effecting solely individual members of the Class. Among the questions of law and fact, common to the Class:

    a.     Whether Facebook represented that it would safeguard Plaintiff's and Class Members' personal information and not disclose it without consent;

    b.     Whether Cambridge improperly obtained Plaintiff's and Class members' personal information without authorization or in excess of any authorization;

    c.     Whether Facebook was aware of the improper collection of Plaintiff's and Class Member' personal information by Cambridge;

    d.     Whether Facebook owed a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their personal information;

    e.     Whether Facebook breached a legal duty to Plaintiff and the Class to exercise due care in collecting, storing, safeguarding, and/or obtaining their personal information;

    f.     Whether Defendant's acts as alleged herein violated the SCA;

g.    Whether Defendant's acts as alleged herein violated the California Customer Records Act (California Civil Code § 1798.80, *et seq.*); Invasion of Privacy; Conversion; and Negligence

47.    Plaintiff brings this action under Rule 23(b)(2) because Defendant have acted or refused to act on grounds generally applicable to all members of the Class, thereby making final relief concerning the Class as a whole appropriate. In the absence of appropriate injunctive relief requiring Defendant to notify all Class Members that their private information has been breached, Class Members will suffer irreparable harm. Defendant's uniform conduct towards Plaintiff and the other members of the Class makes certification under Rules 23(b)(2) appropriate.

48.    Likewise, particular issues under Rule 23(c)(4) are appropriate for certification because such claims present only particular common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to:

49.    Particular issues under Rule 23(c)(4) are appropriate for certification, because such claims present only particular common issues, the resolution of which would advance the disposition of this matter and the parties' interest therein. Such particular issues include, but are not limited to:

a.    Whether (and when) Facebook knew about the improper collection of personal information;

b.    Whether Defendant's conduct was an unlawful or unfair business practice under Cal. Bus. & Prof. Code § 17200, *et seq.*;

c.    Whether Facebook's representations that they would secure and not disclose without consent the personal information of Plaintiff and members of the classes were facts that reasonable persons could be expected to rely upon when deciding whether to use Facebook's services;

d. Whether Facebook misrepresented the safety of its many systems and services, specifically the security thereof, and its ability to safely store Plaintiff's and Class members' Personally Identifiable Information;

e. Whether Facebook failed to comply with its own policies and applicable laws, regulations, and industry standards relating to data security;

f. Whether Facebook failed to meet its obligations under the User Terms of Service;

g. Whether Defendant's acts, omissions, misrepresentations, and practices were and are likely to deceive consumers;

h. Whether Facebook failed to adhere to its posted privacy policy concerning the care it would take to safeguard and protect Class Members' personal information; and

i. Whether Facebook negligently and materially failed to adhere to its posted privacy policy with respect to the extent of its disclosure of users' Personal Information.

## CAUSES OF ACTION

## COUNT I

**(Violation of the Stored Communications Act, 18 U.S.C. § 2701, *et seq*. on behalf of the National Class)**

50.     Plaintiff incorporates all preceding paragraphs by reference as if fully set forth herein.

51.     Plaintiff brings this claim individually and on behalf of the Class against Defendants.

52.     The Stored Communications Act ("SCA") provides a private right of action against "a person or entity providing an electronic communication service to the public" who "knowingly divulge(s) to any person or entity the contents of a communication while in electronic storage by that service." *See* 18 U.S.C. § 2702(a)(1); *see also* 18 U.S.C. § 2707(a) (cause of action).

53.    Facebook is a "person" within the meaning of the SCA and provides an "electronic communication service" as that term is defined in the code. The user information stored by Facebook and compromised by the Breach is encompassed within the definition of "electronic storage" under the SCA.

54.    Facebook violated the SCA by exceeding any authorization to use Plaintiff's and Class members' stored electronic communications by allowing third parties to have access to Plaintiff's and Class members' stored electronic communications, including their profile and PII.

55.    Section 2707 of the SCA allows for declaratory and equitable relief as appropriate and statutory damages of $1,000 per violation, actual and punitive damages, and reasonable attorney's fees and costs.

## **PRAYER FOR RELIEF**

Plaintiff, on behalf of himself and the Class, prays for relief as follows:

A.    For an order certifying that the action may be maintained as a class action and appointing Plaintiffs and their undersigned counsel to represent the Class in this litigation;

B.    For a permanent injunction enjoining Defendant from continuing to harm Plaintiff and members of the Class and the public, and violating California and federal law in the manners described above;

C.    For restitution;

D.    For actual and statutory damages pursuant to SCA;

E.    For nominal, compensatory, and punitive damages where appropriate;

F.    For reasonable attorneys' fees and the costs of the suit; and

G.    For all such other relief as this Court may deem just and proper and may be available at law or equity.

\ \ \

\ \ \

\ \ \

## **DEMAND FOR JURY TRIAL**

Plaintiff hereby demands trial by jury of all claims so triable.


**ZIMMERMAN REED LLP**

Dated: May 1, 2018            By:     /s/ Christopher P. Ridout
                                      Christopher P. Ridout
                                      2381 Rosecrans Ave., Suite 328
                                      Manhattan Beach, CA 90245
                                      Tel. (877) 500-8780
                                      Fax (877) 500-8781
                                      Email: christopher.ridout@zimmreed.com

                                      *Counsel for Plaintiff and the Class*